# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
# CLARKSBURG

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No.: 1:16-CR-52 |
| WARREN LEE McDANIEL, | (JUDGE KEELEY) |
| Defendant. | |

## REPORT AND RECOMMENDATION/OPINION
## RECOMMENDING THAT DEFENDANT'S MOTION TO SUPPRESS BE DENIED

This matter is before the Court pursuant to Defendant Warren Lee McDaniel's "Motion to Suppress" filed on October 3, 2016 (ECF No. 23). United States District Judge Irene M. Keeley referred the pending motion to the undersigned for a Report and Recommendation on October 4, 2016 (ECF No. 24). On October 13, 2016, came the United States of America ("Government"), by counsel, Traci Cook, Assistant United States Attorney, and came Defendant, in person and by counsel, L. Richard Walker, for a hearing on this matter.

### I. Factual Background

The following is derived from a Criminal Complaint completed and signed by Deputy Sheriff and Captain James Root of the Preston County Sheriff's Office on February 23, 2016 (ECF No. 22-1); the video of Defendant's arrest captured by Captain Root's body camera[1] (ECF No. 28), the CAD detail report including Captain Root's field notes (ECF No. 28-1), testimony[2] at the at the October 13, 2016 hearing (ECF No. 27)[3], and the parties' briefs on this matter.

---

[1] Footage of the arrest from Captain Root's body camera was presented to the Court at the October 13, 2016 hearing as Joint Exhibit A in the form of a DVD, which is cited to as Docket Entry 28 (Exhibit and Witness List). This evidence is not directly available on CM/ECF due to its physical format, but is lodged in the Clerk's office.
[2] The Court finds Captain Root's testimony entirely credible and corroborated by the footage from his body camera.
[3] Oral argument and testimony from the hearing is available on Courtroom Streams for the Northern District of West Virginia ("cbg aloi usa v mcdaniel 1 16 cr 52 10 13 16.htm").

On February 23, 2016 at approximately 10:30 p.m., Captain Root responded to a 911 call reporting an alleged assault at Little Sandy's Truck Stop (hereinafter "Little Sandy's") in Bruceton Mills, West Virginia (ECF No. 27 at 9:10:19). The waitress advised Captain Root that Ginger Goodman and an unknown male had gotten upset about slow service. Id. at 9:10:47. Witnesses reported that the male became "unruly" and knocked napkins and condiments off a table, onto the floor. Id. at 9:10:56. When the waitress asked the disruptive patrons to leave, the male got upset and had drawn his fist back as if to strike the waitress. Id. at 9:11:02. Though Defendant did not actually strike her, the waitress told Captain Root that "she was scared because [Defendant] drew his fist back and she felt like she was going to be struck and injured." Id. at 9:43:25. The waitress' report to Captain Root was additionally corroborated by a coworker and another patron at Little Sandy's who also observed the events. Id. at 9:11:23. Captain Root then immediately drove to Ginger Goodman's residence at Krys View apartments, a few miles away, to continue his investigation of the alleged assault. Id. at 9:11:36. Upon arriving at Krys View apartments, before exiting his vehicle, Captain Root turned on his body camera and recorded events continuously from his arrival at Krys View to their return to the Sheriff's Office.

Captain Root knocked on the door to Ms. Goodman's apartment, and Ms. Goodman opened the door (ECF No. 28 at 1:13). Captain Root asked if he could come in and talk to her, and Ms. Goodman readily consented to both. Id.

The two continued to converse as Ms. Goodman left Captain Root's line of sight to get dressed, when Captain Root heard what he immediately recognized as a firearm being "racked" – the "chambering of a round in a handgun" – and exclaimed, drawing his weapon, "What was that?!" (ECF No. 28 at 1:57). Captain Root then observed Defendant pass through his line of sight in the living room with the gun in the "low ready" position, at which point Captain Root ordered Defendant to get back and put the gun down. Id. at 2:00. Defendant then disappeared

2

from view, at which point Captain Root ordered Defendant to come back where he could see him and lay on the ground. Id. at 2:01. Eighteen (18) seconds passed between the time Captain Root first ordered Defendant to get on the ground, and the time Defendant actually laid down as instructed:[4]

With Defendant now lying face down on the floor, Captain Root told Defendant not to go "anywhere near" the pistol, and asked Defendant if he had any other weapons on him (ECF No. 28). Defendant replied that there was a knife in his pocket, and asked Captain Root if he wanted the knife first. Id. Captain Root responded that he would get Defendant's knife after Defendant's hands were secured. Id. Captain Root then secured Defendant's hands behind him in handcuffs and then removed the knife from Defendant's back pocket. Id. Captain Root helped Defendant up into a seated position and asked if there were any other firearms in the apartment. Id. Ms. Goodman and Defendant replied there were not. Id. Captain Root then took the ammunition out of the firearm. Id. At this point, Defendant had been relieved of the knife in his pocket, and the gun he was holding had been secured by Captain Root and unloaded. Id. at 4:20. With Defendant now secured, Captain Root discussed the situation and explained why he had secured Defendant.

---

[4]
| | | |
|---|---|---|
| 1:43 | GG: | You know my name? |
| 1:46 | CR: | Yeah... I don't know much more than that. I smell garlic. |
| 1:53 | GG: | I'm cooking, yes sir – |
| 1:56 | | [sound of gun being racked] |
| 1:57 | CR: | What was that? |
| 1:58 | GG: | (inaudible) |
| 2:00 | CR: | Get back! Put the gun down! Get on the ground! Get on the ground! Hey, come back where I can see you! |
| 2:04 | WM: | (inaudible) I ain't had no gun… |
| 2:06 | CR: | Lay down! |
| 2:07 | WM: | I was just wondering what's going on… |
| 2:09 | CR: | Lay down! |
| 2:11 | WM: | That's her gun, man... I have no problem. |
| 2:15 | CR: | How about laying down? |
| 2:16 | WM: | Okay. |
| 2:17 | CR: | (to Ms. Goodman) Ma'am, don't you move. |
| 2:18 | | [Defendant lies down on the floor] |
| 2:22 | CR: | (to Defendant) You're liable to scare the shit out of a guy, you know that? |
| 2:23 | WM: | (inaudible) everybody drinkin' and everything like that (inaudible). (ECF No. 28 at 1:43). |

Captain Root then asked Defendant for identification (ECF No. 27 at 4:49). While Ms. Goodman looked through Defendant's wallet for his ID, Captain Root asked Defendant for the first time about Little Sandy's – "Did you get in a ruckus down there?" Id. Defendant began to answer, saying "I raised hell with 'em because" – at this point, Captain Root interrupted Defendant to provide Miranda warnings ("You're not under arrest, but I'm doing an interrogation right now" . . . "You understand your rights? That you don't have to talk to me if you don't want to? Okay"). Id. at 5:08.

At this point, it was determined that Defendant's ID was not in his wallet, nor did he appear to have it with him (ECF No. 28 at 5:35). Captain Root then inquired as to Defendant's identity: "What's your first name?" to which Defendant replied, "Warren." Id. at 6:09. Captain Root continued to ask questions about the events at Little Sandy's earlier that evening. Id. Captain Root did not learn Defendant's full name until 8:20, and followed up by asking Defendant's date of birth. Six (6) seconds later, Captain Root asked Defendant if he was allowed to possess a firearm; Defendant eventually admitted he was not.[5]

---

[5]
| | | |
|---|---|---|
| 8:20 | CR: | What's your name? |
| 8:21 | WM: | Warren McDaniel. |
| 8:22 | CR: | What's your middle name, Warren? |
| 8:24 | WM: | Lee. |
| 8:30 | CR: | What's your date of birth? |
| 8:32 | WM: | (inaudible) |
| 8:36 | CR: | Do you have a phone number? |
| 8:37 | WM: | No, I don't have a phone. |
| 8:40 | CR: | Are you allowed to possess a firearm? |
| 8:42 | WM: | Huh? |
| 8:43 | CR: | Are you allowed to possess a firearm? |
| 8:44 | WM: | No, that's not my firearm. |
| 8:45 | CR: | You had a gun in your hand. *Are you allowed to possess a firearm*? |
| 8:50 | WM: | No, I'm not. |
| 8:51 | CR: | Why not? |
| 8:52 | WM: | Huh? |
| 8:53 | CR: | Why not? |
| 8:54 | WM: | I had a felony before.  (ECF No. 28). |

## II. Defendant's Motion to Suppress

Defendant argues first that Captain Root unlawfully detained Defendant because there was no reasonable suspicion that Defendant was 1) engaged in criminal activity or 2) armed and dangerous (ECF No. 23 at 6). Defendant argues in the alternative that if the detention was lawful at its inception, the length of the detention exceeded that necessary for officer safety and thus became unlawful (ECF No. 23 at 8).

## III. Government's Response to Defendant's Motion to Suppress

The Government argues that Defendant was lawfully detained because Captain Root's entry into Ginger Goodman's apartment to investigate an alleged assault was lawful pursuant to a knock and talk, as well as Ms. Goodman's consent to enter her apartment (ECF No. 26 at 5). Captain Root acted within the lawful boundaries of the Officer Safety Exception in placing handcuffs on the Defendant and effecting a lawful Terry stop of reasonable duration under the exigent circumstances created by the Defendant (ECF No. 26 at 8-10).

## IV. Defendant's Reply Memorandum

Defendant subsequently filed a Reply Memorandum on October 17, 2016 (ECF No. 30). Defendant reasserts that no exigent circumstances existed at the time Captain Root seized Defendant and the firearm without a warrant and without consent, and if there were, they were created by Captain Root rather than Defendant. Id. at 1. Defendant further reasserts that the duration of the detention well exceeded the time necessary to address the exigent circumstances. (ECF No. 30 at 6).

## V. Discussion

**1. Captain Root was lawfully in Ms. Goodman's apartment with her consent, lawfully investigating an alleged crime.**

The Fourth Amendment is not implicated when law enforcement officers approach a residence, knock on the door, and attempt to speak with the occupant. United States v. Cephas, 254 F.3d 488, 493-94 (4th Cir. 2001). Here, the occupant, Ms. Goodman, readily consented to both speak to Captain Root and to his entry into her home.[6] Captain Root did not identify himself verbally as a law enforcement officer when he made his request, but testified that he was in full uniform, and was not wearing a coat (ECF No. 27 at 9:14:02). The Court infers that Ms. Goodman was able to ascertain that Captain Root was a law enforcement officer and the parties do not dispute this. Thus, Captain Root was lawfully in Ms. Goodman's apartment, with her consent, lawfully pursuing an investigation of a crime.

2. **Reasonable suspicion that Defendant had been involved in the assault reported by the waitress at Little Sandy's existed independent of Defendant's possession of a firearm.**

An officer may effect an investigative or Terry stop when there is "reasonable suspicion," supported by articulable facts, that criminal activity is afoot. Illinois v. Wardlow, 528 U.S. 119, 124 (2000); Terry v. Ohio, 392 U.S. 1, 30 (1968). Reasonable suspicion is assessed considering the totality of the circumstances, including what information was known to the officer and inferences that could be reasonably drawn at the time of the stop. United States v. Arvizu, 534 U.S. 266 (2002). Reasonable suspicion is a "common-sensical proposition . . . [properly]

---

[6] CR: Hi, Ms. Goodman?
GG: Yes sir.
CR: Can I talk to you?
GG: Most certainly.
CR: Can I come in?
GG: (opens door) Um, can I put some pants on?
CR: Please do, go ahead. I'll just wait right here.
GG: Um, I'm cooking and I have no pants on -
CR: That's fine –
GG: - so, can you hold on?
CR: Yes. (ECF No. 28 at 1:13).

crediting the practical experience of officers [and what they] observe on a daily basis." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993).

Defendant argues that Captain Root could not have reasonable suspicion to believe Defendant's possession of the firearm was criminal because possession of a firearm inside a home is not a crime in and of itself, and because Captain Root did not know Defendant was prohibited from possessing a firearm until he learned Defendant's identity, later into the detention[7] (ECF No. 23 at 3).

The relevance of this claim is not apparent to the Court for two reasons. First, there *was* reasonable suspicion that Defendant had been involved in the *assault*[8] Captain Root was there to investigate. Several witnesses identified Ginger Goodman as the woman accompanying the male in question, and provided a physical description that fit Defendant. Once Captain Root saw Defendant in Ms. Goodman's apartment, the Fourth Amendment permitted him to perform an investigatory stop and question Defendant regarding same. It is therefore unnecessary to reach the question of whether Defendant's possession of the *firearm* gave rise to reasonable suspicion, because reasonable suspicion regarding the *assault* existed independent of – and before, during,

---

[7] Captain Root testified on direct examination at the hearing at 9:21:30:
US: Did you know the individual you had secured in handcuffs, did you know him by sight?
CR: I didn't recognize him, no.
US: At the point that you placed Mr. McDaniel in handcuffs after he appeared with a firearm, did you know his name?
CR: I asked him what his name was, and he told me "Warren." And further on down the questioning, I asked him what his last name was, and he said "McDaniel." And as soon as he said "Warren McDaniel," well, I know who Mr. McDaniel is.
US: And what did you know about Mr. McDaniel?
CR: I knew that, ah… he's got a reputation supposedly of being dangerous, and I knew that he had a felony conviction. I didn't know what the conviction was, for what crime, but I knew he had a felony conviction.

[8] Defendant asserts in his Reply Memorandum that his "investigation has revealed [Defendant's conduct at Little Sandy's] was along the lines of an alleged disorderly conduct event," and his actions did not constitute an assault (ECF No. 30 at 1). Beyond this assertion, Defendant has presented no evidence to support this claim. The Government, on the other hand, has presented significant evidence that Defendant assaulted the waitress. Captain Root testified that the waitress reported to him that Defendant drew back his fist as if to strike the waitress, causing her to fear that she would be struck and injured. Two other witnesses corroborated her account. Captain Root testified that what the waitress described to him was an assault. The Defendant matched the description of the perpetrator. This evidence known to Captain Root goes well beyond reasonable suspicion.

and after - Defendant's possession of a firearm. Second, even if – *arguendo* – it did not, Captain Root's actions were also independently justified under the Officer Safety Exception.

Defendant argues that "when the police officer encountered Mr. McDaniel at the other end of the main hallway, the officer did not know whether Mr. McDaniel was the same person as the man at Little Sandy's," and "the officer admitted at the evidentiary hearing that no identification had been made at that point" (ECF No. 30 at 2). Both points are true, but neither are dispositive. Defendant's identity was relevant only to reasonable suspicion that he possessed a firearm illegally. Defendant's identity was *not* relevant to reasonable suspicion that he committed an assault, since the witnesses who reported the assault did not know his identity and therefore could not report it to Captain Root. Captain Root had only a physical description of the alleged perpetrator, which Defendant matched. Officers are not required to completely *confirm* reasonable suspicions before they may perform an investigative stop – only to possess a suspicion that is reasonable.

The CAD report advised "a male was raising hell with a waitress drew his fist back but did not hit her adv'd he has left in a small black car a ginger goodman was driver off [sic] the car adv'd both intoxicated adv'd the female lives in the krys view apt" (ECF No. 28-1 at 1). The alleged assailant Captain Root sought was with Ginger Goodman; Captain Root found Defendant at Ms. Goodman's apartment in Krys View. The alleged assailant Captain Root sought was described as intoxicated; one of the first things Defendant told Captain Root was that they had been drinking, and Defendant's speech in the video appears clearly slurred.

Captain Root's field notes on the back of the CAD report indicate that witnesses described the male in question as "Male – screaming about not being service [sic], tattoos, short hair, T shirt, blue jeans, no hate [sic – presumably, "hat"], no glasses, scruffy beard" (ECF No. 28-1 at 3). Defendant is male and has visible tattoos. The video of the arrest the night of

8

February 23, 2016 shows Defendant wearing jeans.[9] Defendant also had short hair and facial hair, and was not wearing glasses or a hat.

All of these things were observable or made clear to Captain Root *prior* to learning Defendant's identity, which is when Captain Root realized Defendant had committed a *separate* crime in his presence. But, regardless of who the person Captain Root had in front of him turned out to be, there was certainly reasonable suspicion from the inception that he was the individual Captain Root sought in connection with the alleged assault. There is no question that Defendant bore significant similarity to the perpetrator described by the victim and two other witnesses at Little Sandy's. Further, their reports could be afforded significant credibility because they were corroborated, based on firsthand observation and experience, and the identities of all three witnesses were known to Captain Root (ECF No. 28-1 at 3). This information was not stale, as Captain Root estimated that half an hour had passed from the time he arrived at Little Sandy's, to the time he arrived at Ms. Goodman's apartment (ECF No. 27 at 9:12:17).

These circumstances are well beyond a "mere hunch" or uncorroborated anonymous tip which cannot support reasonable suspicion. Arvizu. 534 U.S. at 274. Captain Root's investigation of a crime that had *already occurred,* had been reported, and also corroborated by credible witnesses distinguishes this case from United States v. Foster. 634 F.3d 243 (reasonable suspicion not supported by chance observation of two men in a parked car, one of whom had a criminal record, the other having reappeared from a crouched position, making movements with his arms).

Even if Captain Root had not had ample reasonable suspicion that Defendant had committed the assault, "[i]f a suspect's response [to an improper investigative stop] is itself a

---

[9] The shirt Defendant is wearing in the video appears that it could be made of T-shirt material, but because the arrest video was filmed in low light, the Court cannot say with certainty. However, Defendant matched more than enough of the descriptors provided to Captain Root to warrant reasonable suspicion regardless.

new, distinct crime, then the police constitutionally may arrest the suspect for that crime." United States v. Sprinkle, 106 F.3d at 619. Thus, even if the investigative stop was improper, it was no barrier to Defendant's subsequent arrest for possessing a firearm. And lastly, the officer safety exception would have independently permitted Captain Root's actions regardless.

### 3. Captain Root's actions were well within the exigent circumstances exception for officer safety; Defendant's detention was not unreasonable in duration or extent.

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. The Fourth Amendment prohibits unreasonable searches and seizures without a warrant, generally, except for a few "specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). Exigent circumstances can permit a warrantless search or seizure, even without probable cause to believe a crime has occurred; exigent circumstances include the officer safety exception. Figg v. Schroeder, 312 F.3d 625.

Though here Captain Root had reasonable suspicion to believe Defendant committed the assault, and though he did not believe he could *arrest* Defendant for that misdemeanor alone, Captain Root still had a duty to *investigate* the assault, which he was lawfully doing in Ms. Goodman's apartment with her consent when he encountered exigent circumstances.[10] Captain Root heard a semiautomatic pistol being racked and observed Defendant holding it at the "low-ready" position. Instead of immediately obeying Captain Root's order to get on the ground, Defendant instead disappeared from view and then reappeared without the pistol. Instead of

---

[10] As discussed at length, Defendant created the exigency when, instead of immediately getting on the ground, he disappeared from Captain Root's view with a loaded firearm. Captain Root's actions were in no way analogous to the officer-created exigencies prohibited by Kentucky v. King, as he was lawfully in Ms. Goodman's apartment to lawfully investigate a crime. 563 U.S. 452 (2011). Captain Root's purpose in knocking on the door was to get *information* for his investigation, not to create a situation that would spur the destruction of evidence.

immediately then obeying Captain Root's orders to lay down, Defendant got slowly to his knees while talking to Captain Root in an inebriated manner for eighteen seconds before laying face down. Defendant also stated he had a knife in his pocket. Defendant was not relieved of the first knife in his pocket and the firearm removed from Defendant's vicinity and unloaded until 4:20 in the arrest video. Thus, it is clear to the Court that Defendant's detention prior to 4:20 was constitutional. Therefore, any statements Defendant made or evidence obtained prior to 4:20 were clearly legally obtained and properly admissible.

Defendant argues that once Captain Root removed the firearm and knife from Defendant's pocket, Defendant was neither armed nor dangerous and should not have been detained past that point (ECF No. 23 at 3). Defendant was in fact still armed at that time, and remained armed until a full ten (10) minutes into the arrest video, when Captain Root searched Defendant incident to (what was now, at 9:55) a lawful arrest, and found a second knife still on Defendant's person (ECF No. 28 at 10:10). This was a second knife that Defendant failed to mention previously when asked about weapons by Captain Root. Captain Root was cognizant of the possibility that more weapons could be on the Defendant, as he had not completely patted Defendant down yet. (ECF No. 27 at 9:25:52).

Defendant was, however, still apparently under the influence after being relieved of two weapons at the 4:20 mark. Defendant argues that "Anything Mr. McDaniel said about drinking and any form of "slurred speech" after the seizure and while Mr. McDaniel was in a state of detention, not before" (ECF No. 30 at 2). Defendant spoke a number of sentences to Captain Root in the twenty (20) seconds before he had complied with Captain Root's instructions to lay down on the ground, and the slurring was evident not only Captain Root, but also to the Court in the arrest video. Captain Root testified that Defendant also appeared unsteady, which was also apparent on the arrest video, and once he got close enough to Defendant to interact with him, he

11

observed that Defendant's eyes were glassy and bloodshot. (ECF No. 27 at 10:10:38). Captain Root testified that in his many years in law enforcement, his experience with intoxicated individuals is that their behavior can be unpredictable – compliant one moment and violent the next (ECF No. 27 at 10:13:12).

Defendant further apparently argues that it was unreasonable for Captain Root to have a concern for his safety upon hearing the slide of the firearm being "racked," because he could have no way of knowing whether Defendant's intentions were entirely innocent in manipulating the firearm. The Court is aware of no requirement that an officer presume every firearm empty until proven loaded, or any requirement that an Officer get close enough to a suspect with a weapon to determine if the safety is on or off, in order for the officer safety exception to apply. Just the opposite - the only prudent assumption is that a gun is always loaded.[11]

Defendant also argues that Captain Root did not have a subjective safety concern because '[t]he officer realized there was a misunderstanding and the body camera captured the officer commenting that Mr. McDaniel was evidently protecting the home without the knowledge that the officer was a member of law enforcement" (ECF No. 23 at 3). Captain Root, however, testified that he made those statements not because he believed them to be true, but rather in an attempt to de-escalate the situation and calm the Defendant (ECF No. 27 at 10:07:02).

What was known to Captain Root at 4:20, once the two weapons he *knew about* were removed from Defendant's reach, was that:

1) There was reasonable suspicion that Defendant had already committed one violent (or at minimum, physically threatening) crime that evening;

2) There was reasonable suspicion that Defendant was intoxicated based on physical

---

[11] "Never assume a firearm is unloaded . . . Treat all firearms as if they are loaded." NRA Staff. Passive Safety Systems for Guns. Tuesday, October 11, 2016. Retrieved October 19, 2016 from https://www.nrafamily.org/articles/2016/10/11/passive-safety-systems-for-guns/

signs and Defendant's own admission he had been drinking;

3) Captain Root's prior law enforcement experience with intoxicated individuals was that they have at times become unpredictably violent with little notice;

4) By this point, Captain Root already had to relieve Defendant of one knife and one *loaded* firearm, which Captain Root reasonably believed Defendant had prepared to shoot[12]; and

5) Captain Root had not yet patted Defendant down completely to see if there were any more weapons on him, and Captain Root was conscious of the fact that this was a possibility. (ECF No. 27 at 9:25:52).

The combination of all of these factors led Captain Root to restrain Defendant in handcuffs to ensure his safety while he concluded his investigation. From the time Captain Root had removed the pistol and first knife from the Defendant until the time he realized Defendant had committed a crime in his presence, Defendant had been detained for approximately four

---

[12] Captain Root testified at the hearing at 10:19:26:
US: Did he immediately follow your instructions, that you ordered him to drop that firearm?
CR: I don't know if immediately, because he was out of view for a couple of seconds.
US: In fact he didn't drop the firearm, he left your view.
CR: That's correct.
US: Do you know what he was doing there?
CR: No, I don't.
US: Do you know if anybody else was in the living room?
CR: I had no idea. And to this day, I don't know if anybody was upstairs.
US: So, when Mr. McDaniel disappears from your view, what do you know?
CR: I know there's a man with a pistol that I can't see anymore. I have what I perceive to be a threat, but I don't know the exact location of that threat now.
US: Let's back up a moment to this racking of the gun. When you heard this racking of the gun, a sound familiar to you, what did you believe had occurred?
CR: That somebody had chambered a round into a pistol.
US: To do what?
CR: To shoot me.
[Defense counsel objects]
US: Did you believe that's what was going to happen?
CR: Yes, because I made mention earlier, in my job, coming across firearms all the time – rural county, Preston County – nineteen years, I've never had a round racked into the chamber in my presence, other than at the firing range with other officers. So, it's a little unnerving.

minutes. By the time Captain Root told Defendant he was under arrest for that second crime, approximately four and a half minutes had passed.

Law enforcement officers may restrain and detain individuals in handcuffs during a law enforcement investigation without converting a lawful Terry investigative stop into a de facto arrest. United States v. Leshuk, 65 F.3d 1105, 1108-09 (4th Cir. 1995). There is no "hard and fast time limit" which delineates a Terry stop and a de facto arrest, but rather a requirement that the officer "diligently pursue[] investigation that [is] likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." United States v. Sharpe, 470 U.S. 675, 676 (1985). In this case, four (4) to four and a half (4:30) minutes is clearly not excessive under the circumstances. The Court can find nothing unreasonable or unconstitutional about Defendant's detention or the duration of it.[13]

## RECOMMENDATION

For all the above reasons, the undersigned cannot find any instance in the events of February 23, 2016, in which Defendant's Fourth Amendment rights were violated by Captain Root. As such, the undersigned recommends Defendant's Motion to Suppress (ECF No. 23) be **DENIED.**

Any party may, **within ten (10) days**[14] after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of

---

[13] Captain Root, rather than resorting to escalating force in response to Defendant's actions, employed significant efforts to *de-escalate* the situation. The Court also recognizes how helpful it was that the Preston County Sheriff's Office outfitted their officers with body cameras, and that Captain Root had his on. Having the video available to review the actual events at issue was of significant help and assistance to the Court in deciding the issues of this Motion.

[14] "Although parties are typically given fourteen days to respond to a Report and Recommendation, *see* 28 U.S.C. § 636(b)(1), this allowance is a maximum, not a minimum, time to respond, and the Court may require a response within a shorter period if exigencies of the calendar require. United States v. Barney, 568 F.2d 134, 136 (9th Cir.1978)." United States v. Cunningham, 2011 WL 4808176, at Footnote 1 (N.D. W. Va., Oct. 6, 2011). See also United States v. Mason, 2011 WL 128566, at Footnote 7 (N.D. W.Va., Jan. 7, 2011). In this case, the hearing on the Motion to Suppress was held on October 13, 2016. Defense counsel requested additional time to file a reply brief before the Court made its ruling; the Reply was subsequently filed on the evening of October 17, 2016, which in

the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 20 day of October, 2016.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE

---

turn delayed the Report and Recommendation. Because the final pretrial conference is scheduled for November 4, 2016, the resulting calendar exigency thus warrants shortening the period with which to file objections to the Report and Recommendation from fourteen (14) days to ten (10) days.